[Cite as *State v. Alexander*, 2020-Ohio-1374.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. John W. Wise, P.J. |
|     Plaintiff-Appellee | Hon. Patricia A. Delaney, J.<br>Hon. Earle E. Wise, Jr., J. |
| -vs- | |
| | Case No. 19 CA 0099 |
| QUVADUS ALEXANDER | |
|     Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:        Criminal Appeal from the Court of Common
Pleas, Case No.  18 CR 00882


JUDGMENT:        Affirmed


DATE OF JUDGMENT ENTRY:        April 7, 2020


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

WILLIAM C. HAYES                WILLIAM T. CRAMER
PROSECUTING ATTORNEY        470 Old Worthington Road
ERIC M. DEPUE                Suite 200
ASSISTANT PROSECUTOR        Westerville, Ohio  43082
20 South Second Street, 4th Floor
Newark, Ohio  43055

*Wise, John, P. J.*

{¶1} Defendant-Appellant Quvadus Alexander appeals his conviction by the Licking County Court of Common Pleas following a guilty plea to one count of aggravated trafficking in drugs

{¶2} Plaintiff-Appellee is the State of Ohio.

## STATEMENT OF THE FACTS AND CASE

{¶3} The relevant facts and procedural history are as follows:

{¶4} Appellant Quvadus Alexander was indicted for drug trafficking involving over ten grams of heroin in violation of R.C. §2925.03(A)(2)/(C)(6)(e), a second degree felony. The indictment included a forfeiture specification for currency under R.C. §2941.1417(A) and R.C. §2981.02(A)(2).

{¶5} On February 11, 2019, Appellant filed a motion to suppress the heroin.

{¶6} On April 5, 2019, the matter proceeded to a suppression hearing where the following information was presented:

{¶7} Detective Green testified that he was assigned to the Central Ohio Drug Task Force. Green first learned of Alexander in 2015 when an informant claimed that a group of young men from Chicago were coming down to Newark, staying at a specific house, and selling heroin. They were allegedly travelling back and forth every couple of weeks on a Greyhound bus. The group included several individuals who had been investigated, been the targets of search warrants, or been arrested for trafficking or weapons offenses. Det. Green had seen Alexander with a couple of those individuals. The drug task force had been investigating Alexander since 2015. (T. at 9-11, 14-15). Alexander's street name was "Kaine." Green verified the nickname on Facebook, where

Alexander was listed as "D Block Kaine." Other confidential sources said they purchased heroin from "Kaine." Over the years, Det. Green heard Alexander referred to by other names as well, including "Co", "Cocaine", or "K." (T. at 9-10).

{¶8}   On October 11, 2017, Det. Green observed what appeared to be a drug transaction between Alexander and a known drug user. Green stopped the drug user and spoke with her, and she admitted purchasing heroin from "Kaine." (T. at 11-13).

{¶9}   On October 30, 2017, the drug task force executed a search warrant on a suspect house. They recovered handguns and methamphetamine, and perhaps some heroin. Det. Green had seen Alexander and at least one of the other Chicago dealers on the porch of this house before. One of the occupants of the house told the officers that the homeowner was allowing the Chicago dealers to stay at the house, and they were travelling back and forth on the Greyhound bus. One of the dealers was named "K." (T. at 12-13).

{¶10}  In November, 2018, another informant claimed she had purchased heroin from "Kaine," who comes down from Chicago. The informant said he sometimes stays at the University Inn or with a man named Ducket, who Det. Green was familiar with. (T. at 15-16).

{¶11}  On November 27, 2018, Ducket was stopped by the Heath P.D. and heroin was found. Det. Green spoke with Ducket, who said he just purchased the heroin from Alexander about 45 minutes earlier, and that Alexander probably had 30 grams with him. Ducket said that Alexander was getting a ride to the University Inn from one of his drivers named "Big E." (T. at 16-18).

{¶12} Det. Green had an idea who Big E was and located his name on the registry at the University Inn. The drug task force subsequently began surveillance on the hotel room. A short time later, another detective saw Big E pull up in front of the room, and Alexander exited the vehicle and entered the room. (T. at 18-19).

{¶13} Det. Green went to obtain a search warrant for the hotel room. While he was doing so, plain clothes officers made contact with Alexander at a McDonald's restaurant across the street from the hotel. Det. Green subsequently interviewed Alexander at the station. During the interview, Alexander explained that they use the Greyhound because there are no dogs or police, and that he comes to Newark because it is less dangerous then Chicago, his heroin is better than what they have in Newark, and he can make $2,500 in three days. (T. at 20-23).

{¶14} Det. Vogelmeier was also assigned to the drug task force and was also familiar with Alexander and the group of dealers coming down from Chicago. (T. at 29-31).

{¶15} On November 27, 2018, Vogelmeier was in uniform when he was called in to assist with the search warrant at the University Inn. Plain clothes detectives advised that Alexander had left the Inn and walked to a nearby McDonald's restaurant, where he was using his telephone and looking around. It was decided that the uniformed officers would approach Alexander and attempt to speak with him outside the restaurant. (T. at 32-34).

{¶16} Det. Vogelmeier entered the restaurant while Alexander was in line at the counter. Alexander looked at Vogelmeier and dropped his receipt. Vogelmeier walked up to Alexander as if he were getting in line. As Vogelmeier approached, Alexander bent

over to pick up his receipt. As he did so, Vogelmeier was able to see a clear plastic container with marijuana in Alexander's right coat pocket. Vogelmeier was about five or six feet away at the time. At the same time, Vogelmeier noted an overwhelming smell of raw marijuana. (T. at 35-37).

{¶17} At that point, Alexander stood up and put his hand in his left coat pocket. The detective asked him to remove it, but he continued sticking his hand in his pocket. Due to the fear of weapons and safety of the restaurant patrons, Alexander was immediately detained, placed in handcuffs, and taken outside the restaurant. By then, a couple of plain clothes detectives had joined Vogelmeier. (T. at 38-39). As they were walking to the patrol car, Vogelmeier asked Alexander if he had any weapons on him, and he responded something to the effect of 'only my dope' or drugs. Vogelmeier Mirandized Alexander and searched him. In Alexander's right coat pocket, Vogelmeier found a couple grams of raw marijuana in a clear plastic container, like a sandwich container, that was sealed with a lid and was about two inches square. In Alexander's left coat pocket, Vogelmeier found a large bag of heroin, digital scales, and some baggies. Vogelmeier transported Alexander to the station where Det. Green conducted an interview. (T. at 40-46).

{¶18} An inventory sheet from the search indicated that heroin, U.S. currency, and a cellular phone were found "on his person," meaning Alexander. (T. at 48). The inventory sheet also listed the plastic container with marijuana, but did not say where it was found. The inventory sheet indicated that a digital scale was found in the hotel room, but made no reference to any other digital scales. Det. Vogelmeier testified that Alexander had a "very small" digital scale on his person and explained that it may have been recorded as

generic "paraphernalia." Det. Vogelmeier further explained that the generic "paraphernalia" on the inventory form may also refer to the baggies. (T. at 48-52).

{¶19} The defense had the inventory form admitted as an exhibit.

{¶20} Appellant also testified at the suppression hearing. He testified that his jacket pockets were zipped up that day to make sure none of his possessions fell out. Appellant admitted that he had a clear plastic container with a white lid in his pocket, but testified that the lid was snapped shut for the purpose of sealing in any odors, so you could not smell what was in it. Appellant denied that the container had any marijuana left because it had been used earlier that day. Appellant also denied having any baggies or other paraphernalia in his pockets. (T. at 55-59).

{¶21} At the conclusion of the hearing, the trial court took the motion under advisement.

{¶22} By Judgment Entry filed August 26, 2019, the trial court denied the motion, finding: "the State possessed sufficient reasonable suspicion to detain the defendant for his arrest on the basis of having seen marijuana on his person."

{¶23} On October 1, 2019, at a change of plea and sentencing hearing, Appellant entered a plea of no contest. The trial court sentenced Appellant to seven (7) years of mandatory prison time with 308 days of jail credit, and waived the mandatory fines due to indigency. The cash that was found on Appellant was forfeited pursuant to the specification. *See also,* Judgment Entry 10/1/19.

{¶24} Appellant now appeals, raising the following assignment of error for review:

## ASSIGNMENT OF ERROR

**{¶25}** "I. APPELLANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE STATE AND FEDERAL CONSTITUTIONS WAS VIOLATED WHEN COUNSEL FAILED TO CHALLENGE HIS ARREST AS UNCONSTITUTIONAL BECAUSE IT WAS BASED ON MINOR MISDEMEANOR MARIJUANA POSSESSION."

### I.

**{¶26}** In his sole assignment of error, Appellant argues he was denied the effective assistance of counsel. We disagree.

**{¶27}** Our standard of review for ineffective assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ohio adopted this standard in the case of *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. *Id.*

**{¶28}** Trial counsel is entitled to a strong presumption all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998). In addition, the United States Supreme Court and the Ohio

Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, *quoting Strickland* at 697, 104 S.Ct. 2052. Even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶29} Appellant herein argues his counsel was ineffective in failing to challenge his arrest as unconstitutional because it was based on minor misdemeanor marijuana possession.

{¶30} Appellant asserts that, pursuant to *State v. Brown,* 99 Ohio St.3d 323, 2003–Ohio–3931 and *State v. Jones*, 88 Ohio St.3d 430, 2000-Ohio-374, his counsel should have argued that the heroin be suppressed due to an unconstitutional arrest for a minor misdemeanor offense.

{¶31} While officers could not arrest Appellant for the minor misdemeanor possession of marijuana offense, the officers were authorized to detain Appellant. *See Knowles v. Iowa,* 525 U.S. 113, 117 (1998) (concluding that the detention of a person to be issued a citation does not amount to a full custodial arrest, but is "more analogous to a so-called 'Terry stop' "). *See also State v. Spikes,* 11th Dist. No.2005–L–039, 2006–Ohio–1452, ¶ 23–24 (where the officer did not frisk the suspect as a search incident to an arrest for a minor misdemeanor, but rather frisked the defendant out of concern that defendant had a weapon, the pat-down "was not a search incident to an arrest" and the defendant was "not actually arrested until after Officer Moon discovered a bag of cocaine").

{¶32} In determining when an arrest has taken place, courts have found that an officer requesting that an individual sit in his cruiser does not automatically escalate an investigative detention into an arrest. *State v. Pickett* (2000), 8th Dist. No. 76295, 2000 WL 1060653, *State v. Carlson* (1995), 102 Ohio App.3d 585, 657 N.E.2d 591. Additionally, courts, including this one, have found that the handcuffing of a defendant does not automatically transform an investigative detention into an arrest. *State v. Williams* (2001), 5th Dist. No. 01–CA–00026, 2001 WL 1744474 "[a] police officer may use handcuffs in the course of an investigatory detention, as long as the use of handcuffs is reasonable under the circumstances."; *State v. Mays* (1995), 104 Ohio App.3d 241, 661 N.E.2d 791; *Columbus v. Dials,* 10th Dist. No. 04AP–1099, 2005–Ohio–6305. Additionally, courts have found that the recitation of Miranda rights to an individual under investigative detention does not necessarily mean that the detention has become an arrest. *State v. Broomfield* (1996), 2d Dist. No. 95–CA–0103, 1996 WL 537478.

{¶33} Here, Det. Green testified he had knowledge that Appellant had previously been staying in a house where firearms were seized during the execution of a search warrant. (T. at 13, 15). He also testified that drug dealers were known to carry firearms and that specifically, individuals from Appellant's crew from Chicago had been found possessing firearms. (T. at 14). Detective Vogelmeier testified that he was familiar with Appellant and other individuals coming in to Licking County from Chicago to traffic heroin. (T. at 30). He also stated that drug traffickers carry firearms to "protect their investment". (T. at 35). Det. Vogelmeier testified that he approached Appellant and attempted a consensual encounter, at which time he observed marijuana in Appellant's right coat pocket. (T. at 38). When Appellant refused to remove his hand from his left coat pocket,

Det. Vogelmeier detained Appellant by placing him in handcuffs. (T. at 39). While Det. Vogelmeier walked Appellant out to his cruiser, he asked him if he had any weapons on his person, to which Appellant replied that he only had drugs on him. (T. at 39). At that time, Det. Vogelmeier Mirandized Appellant, searched him and found heroin in Appellant's left coat pocket. Detectives then transferred Appellant to the Newark Police Department where he was interviewed and subsequently placed under arrest.

{¶34} We find the nature of the encounter here justified more precautions. *State v. Shirey*, 5th Dist. Fairfield No. 04 CA 68, 2005-Ohio-5952, ¶ 25 (finding Appellant was not under arrest even though removed from vehicle at gunpoint, handcuffed, made to kneel and placed in back of cruiser because the nature of the encounter justified more precautions).

{¶35} Based on the totality of these circumstances, we find that the investigative detention of Appellant was not an arrest, and that the trial court did not err in overruling the motion to suppress.

{¶36} As there is a strong presumption all decisions fall within the wide range of reasonable professional assistance, we do not find that Appellant has shown that he was provided ineffective assistance of counsel.

{¶37} We further find, based on our analysis, that Appellant has failed to show that the result in this matter would have been different had counsel made such argument.

**{¶38}** Appellant's sole assignment of error is overruled.

**{¶39}** Accordingly, the judgment of the Court of Common Pleas, Licking County, Ohio, is affirmed.

By: Wise, John, P. J.

Delaney, J., and

Wise, Earle, J., concur.

JWW/d 0406